J-A11009-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: A.A., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.A. FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1561 MDA 2023 |

Appeal from the Order Entered October 16, 2023
In the Court of Common Pleas of Tioga County Orphans' Court at No(s):
50 OC 2023

| | | |
|---|---|---|
| IN RE: A.A., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.A., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1562 MDA 2023 |

Appeal from the Order Entered October 16, 2023
In the Court of Common Pleas of Tioga County Orphans' Court at No(s):
49 OC 2023

BEFORE: BOWES, J., STABILE, J., and MURRAY, J.

MEMORANDUM BY BOWES, J.:                **FILED: JULY 11, 2024**

A.A. ("Father") appeals from the orders entered on October 16, 2023,

terminating his parental rights as to his two sons, A.F.A., born June 2016, and

A.M.A., born June 2018.[1]  We affirm.

---

[1] Separately, on August 31, 2023, the trial court entered separate decrees
voluntarily terminating the parental rights of the children's biological mother,
B.S. ("Mother"), as to both boys.

We glean the following background from the certified record. The Tioga County Department of Human Services ("DHS") first began providing services in relation to A.F.A and A.M.A in May and June 2021, when Mother was briefly incarcerated after testing positive for drug use while on probation. Several months later, DHS learned that Mother and Father had been involved in a domestic dispute spanning the course of three days. The conflict included multiple instances of Mother getting drunk to the point of passing out, her throwing objects at Father and striking him, Father smacking and shoving Mother in front of the boys, heated arguments between the two, and Father blacking out while driving a vehicle with one of the children in it due to purported stress from the relationship difficulties. As a result of those incidents, Mother filed for a protection from abuse ("PFA") order against Father, which was resolved when the parties agreed to entry of an order without admission of guilt. The order gave Mother primary physical custody of both children and permitted Father to exercise custody on weekends. Separately, Father was charged with several crimes relating to the events. He ultimately pled guilty to simple assault and was sentenced to probation.

In January 2022, Mother was evicted from her home and she moved in with several other individuals. Toward the end of that month, Father, who did not live in that household, notified DHS that there were drugs being used in the house and stored within the reach of A.F.A. and A.M.A. He also told DHS that Mother and the other adults in the house appeared to be under the influence while supervising the children. After a brief investigation, which

included the involvement of the Pennsylvania State Police, DHS found out that on at least one occasion, Father returned the children to Mother's custody despite knowing about the presence and use of drugs. Father cited the PFA order as the reason why he felt the need to relinquish the children, notwithstanding the known danger. DHS requested and obtained custody of the boys on February 2, 2022. The children were not given to Father based on several concerns, including the safety of Father's home and DHS's belief that Father demonstrated a lack of protective capacity by returning the children to a house with known access to drugs.

The dependency court held a stipulated adjudicatory hearing on February 28, 2022, after which it adjudicated both boys dependent. It also ordered Father to allow DHS direct access to his home and to enroll and meaningfully participate in a course for men against violence. The court set the permanency goal for the children as reunification with Father and Mother. In the interim, DHS placed A.F.A. and A.M.A. with a foster family, but relocated them within less than a month at the foster family's request because of the destructive behaviors exhibited by A.F.A. and the boys' adjustment disorders. After placement with several other families was unsuccessful, the court transferred the boys into their current pre-adoptive home with the Thompson family, where they both began to thrive.

The dependency court held several permanency review hearings thereafter. In addition to the conditions imposed previously, the court further ordered that Father comply with the following: participate in two separate

parenting programs, one of which focused on substance abuse and required home visits; obtain a drug and alcohol assessment; undergo a psychological assessment; and follow all recommendations from the evaluations. However, during subsequent review hearings, the court found that Father failed to abide by most of these requirements, and therefore continued to push back the anticipated date of reunification.

DHS filed petitions for termination of Mother's and Father's parental rights as to both children on May 19, 2023, asserting that Father's rights should be terminated pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8), as well as § 2511(b). The orphans' court appointed Trisha Jasper, Esquire, as guardian *ad litem* ("GAL"), and Timothy Reitz, Esquire, as legal interest counsel, to represent both A.F.A. and A.M.A. The court also named Susan Lehman as a court-appointed special advocate on behalf of both children. The court held an extensive hearing as to DHS's petitions over the course of four days in August and September of 2023. Therein, DHS called numerous witnesses, including Father as if on cross-examination, who testified in accordance with the above.

Additionally, the evidence bore out that during the pendency of these matters, Father was arrested and incarcerated multiple times on bench warrants for unrelated cases. During his probation, Father tested positive for methamphetamine use four times and failed to report to his supervising officer

on seven occasions. This led Father's probation officer to file for revocation of probation in August 2023, a short period before the hearing began.[2]

Furthermore, a substantial portion of the testimony concerned Father's compliance with the court-ordered goals, as well as his attempts for reunification.[3] The witnesses established that Father worked several jobs in the oil and gas field that entailed long, irregular hours. As such, he often failed to confirm appointments or otherwise remain in steady communication with the various service providers.[4] This included confirming visitations with A.F.A. and A.M.A., which caused Father to miss fifty-three out of an available 106 available visits with the boys. With respect to Father's participation in his parenting courses, Father did not enroll until eight months after the children were removed. Even after enrolling, he made no progress in the program due to poor compliance, and refused a urine test on one occasion. Regarding completion of a domestic violence program, Father underwent an initial intake, but never registered thereafter.

Father did receive several drug and alcohol evaluations during the period between the children's removal and the hearing. The first few evaluations

---

[2] The result of the revocation was still pending as of the commencement of the hearing.

[3] Part way through the proceedings, Mother instructed the court that she was willing to consent to termination of her parental rights as to both children.

[4] However, Father testified that several months before the hearing, he lost his commercial driver's license in part because he failed his Department of Transportation physical, and therefore was no longer employed.

recommended no treatment based on the information that Father provided during the assessment; nevertheless, Father's testimony demonstrated that he tested positive for methamphetamine during that period. Father ultimately conceded that he was not forthright with the individuals conducting the assessments. Yet after Father was arrested for purported violations of probation, and accordingly risked additional jail time, he underwent another evaluation wherein he disclosed the full nature of his drug habit. A recommendation was then made for inpatient treatment, which Father had not scheduled or pursued as of the date of the termination hearing. Father testified that while he did begin receiving counseling for his addiction, he only attended four sessions in the five-month period between April 2023 and August 2023.

Concerning the requirement that Father obtain a psychological evaluation, the testimony established that Father underwent such an assessment with clinical psychologist, J.F. McNamara, Ph.D. Dr. McNamara recommended individualized counseling and anger management training. Father testified that he disagreed with the assessment, in part because he believed that Dr. McNamara considered allegations of criminal acts that were never proven. Despite his quarrel with the report, Father did not receive any other evaluations or second opinions.

DHS also introduced testimony concerning the progress A.F.A and A.M.A. made while in the care of the Thompson family. Although both boys, and A.F.A. in particular, had trouble adjusting to foster placement, they both

showed substantial improvement within approximately one month of being placed with the Thompsons. Both children were attending individualized therapy sessions to help them cope with their respective adjustment disorders. Further, Caroline Phillips, a clinical supervisor, attested that Father's inconsistent visits with the children and frequent cancellations were hurtful rather than helpful. She also noted that the boys have bonded with the Thompson family and are treated as equal family members, and that the Thompsons want to adopt the boys.

With respect to termination of Father's parental rights, the court-appointed advocate, Ms. Lehman, recommended that the court abandon the goal of reunification and replace it with the aim of adoption by the Thompson family. Attorney Reitz relayed that A.F.A and A.M.A., then ages six and four, respectively, expressed that they wanted to be adopted, but to a lesser extent, also wanted to be able to visit with Father. The GAL argued that the boys needed permanency and that their best interests would be served by adoption with the Thompson family.

On October 16, 2023, the court entered findings of fact and conclusions of law, and issued separate orders terminating Father's parental rights as to both children pursuant to § 2511(a)(2) and (b). Notably, it found that DHS had not met its burden of proving grounds for termination pursuant to § 2511(a)(1), (5), or (8). In each case, Father filed contemporaneously notices of appeal and statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). The orphans' court entered an order and opinion

pursuant to Rule 1925, referring us to its findings of fact and conclusions of law. We consolidated the appeals *sua sponte*.

Father presents two issues for our consideration:

I. Did the trial court err in involuntarily terminating the parental rights of Father to [the c]hildren, pursuant to 23 Pa.C.S. § 2511(a)(2)?

II. Did the trial court err in finding that involuntary termination of parental rights of Father to [the children] would be in the best interests of the developmental, physical and emotional needs and welfare of [the c]hildren, pursuant to 23 Pa.C.S. § 2511(b)?

Father's brief at 6 (cleaned up).

We begin with our well-settled standard of review:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but it does not require the appellate court to accept the lower court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the trial court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. However, we must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re Adoption of C.M.*, 255 A.3d 343, 358–59 (Pa. 2021) (cleaned up). We have stated that "if competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

Termination of parental rights is governed by § 2511 of the Adoption Act and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child, which we have described as follows:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [§] 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [§] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re Adoption of B.G.S.*, 245 A.3d 700, 705 (Pa.Super. 2021) (citations omitted). The bases for termination must be proven by clear and convincing evidence, or evidence "that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Int. of M.E.*, 283 A.3d 820, 831 (Pa.Super. 2022) (citation omitted).

Termination is proper when the moving party proves grounds for termination under any subsection of § 2511(a), as well as § 2511(b). *See In*

*re N.A.M.*, 33 A.3d 95, 100 (Pa.Super. 2011).   Here, we consider

§ 2511(a)(2) and (b), which provide in pertinent part as follows:

> **(a)** **General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . . .
>
> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  . . .

23 Pa.C.S. § 2511.

The grounds for termination of parental rights pursuant to § 2511(a)(2)

due to parental incapacity are not limited to affirmative misconduct, but may

also include acts of refusal and inability to perform parental duties.  *See In*

*re S.C.*, 247 A.3d 1097, 1104 (Pa.Super. 2021).  We have recognized that

"where a child is in foster care, a parent has the affirmative duty to work

towards the return of the child by cooperating with the [a]gency to obtain the

rehabilitative services necessary for h[im] to be capable of performing h[is]

parental duties and responsibilities." *Interest of A.M.*, 256 A.3d 1263, 1270-71 (Pa.Super. 2021) (citation omitted).

Father contends that DHS did not carry its evidentiary burden, first arguing that "there is no evidence of any incapacity, abuse, neglect or refusal by Father that caused the [c]hildren's placement." Father's brief at 11. He acknowledges that "[w]hile Father struggled with sobriety, there is no evidence to support a finding that his drug use impacted his ability to provide essential parental care, control or subsistence for the [c]hildren or that he could not or would not remedy that drug use." *Id*. at 13. Father concludes thusly:

> There was never any evidence presented that Father was unable or unwilling to meet the [c]hildren's basic needs: there was no evidence that Father lacked suitable housing, had ever abused the [c]hildren, had failed to ensure that they receive proper medical and dental care, or had failed to provide for their basic needs in any way. Section 2511(a)(2) presupposes the existence of incapacity, abuse, neglect or refusal of the parent to provide for the child. Without evidence that Father failed to care for the [c]hildren in the first place, there can be no finding that Father repeated and continued to fail to provide case for the [c]hildren.

*Id*. at 15. In other words, Father criticizes the orphans' court for concluding that he did not remedy the conditions and causes of the incapacity, when those causes arose while the children were under the care of Mother, not Father.

In response, the orphan's court offered the following analysis:

> In essence, in order for [Father] to exercise the parental care, control, and subsistence contemplated by 23 Pa.C.S. § 2511(a)(2) as to [A.F.A.] and [A.M.A.], he needed to comply

- 11 -

with the requirements for reunification set forth by [DHS] and th[e] court. Over the course of the nearly fifteen months between the date the children were removed by [DHS] and the date the petition for involuntary termination of parental rights was filed, [Father] repeatedly failed or refused to do so.

Following a stipulated adjudicatory hearing held on February 28, 2022, [Father] was ordered by th[e] court to allow access to his home, participate in services that had been offered to him, and enroll in the [men against abuse] program and meaningfully attend. A dispositional order filed by th[e] court on March 23, 2022, imposed additional requirements: that [Father] participate in the [effective safe parenting] program, the fatherhood program, obtain a drug and alcohol assessment, obtain a psychological evaluation, and follow any and all recommendations from said evaluations. Several permanency review hearings followed: on July 7, 2022, [Father] was found to have made no progress whatsoever as to the goals presented to him for reunification; on October 11, 2022, [Father] had shown minimal compliance with the permanency plan; on January 10, 2023, [Father] showed improvement and was in moderate compliance with the permanency plan; on April 10, 2023, [Father] had regressed to minimal compliance with the permanency plan.

After each of these permanency review hearings, the goal remained reunification and the date by which that goal might ideally be accomplished was extended. Despite these numerous opportunities for [Father] to satisfy the necessary requirements for him to regain custody of his children, he was never found to be in more than moderate compliance with these goals. Not only did he fail or refuse to do what was required by him of [DHS] and th[e] court, he also failed to refrain from engaging in conduct that made the possibility of reunification more remote. He tested positive for methamphetamines on October 17, 2022, January 15, 2023, July 17, 2023, and July 24, 2023. He was incarcerated multiple times, most recently for failure to comply with the conditions of his probation. His employment at Gas Field Specialists, frequently cited as the reason he could not routinely attend scheduled visits with his children, was terminated following his arrest for driving under the influence and his [commercial driver's] license is now suspended.

Proposed Findings of Fact and Conclusions of Law, 10/16/23, at unnumbered 33-34 (cleaned up). As such, the court concluded that when considered in totality, Father's actions prevented placement of the children with him, and that his neglect "caused the children to be without essential parental care, control or subsistence necessary for their physical or mental well-being." *Id*. at unnumbered 33.

Upon review, we find that the certified record supports the orphans' court's conclusions. The fact that A.F.A and A.M.A. were removed while in Mother's care, not Father's, does not preclude the court from finding that DHS proved by clear and convincing evidence that Father's parental rights should be terminated pursuant to § 2511(a)(2). Father's position is not supported by either the law or the record. First, the removal of the children from a parent's care is not an element of § 2511(a)(2). Indeed, this subsection focuses upon Father's capacity to provide parental care and control, generally, rather than any specific incident that required DHS to intercede and place the children in foster care.

Furthermore, the record reveals several valid reasons as to why DHS could not place the children with Father after they were removed from Mother's home, including Father's habitual methamphetamine abuse and concerns over domestic violence. The court correctly noted that Father did not take adequate steps to address these concerns or meet the permanency goals to reunify with his children, despite having numerous opportunities do

so. Father only saw the children at fifty-three out of an available 106 available visits, indicating that he prioritized his work schedule over the need to parent his sons. In short, the record supports the orphans' court's finding of clear and convincing evidence to terminate Father's parental rights because Father failed to fulfill his "affirmative duty to work" towards reunification. **Interest of A.M.**, 256 A.3d at 1270-71.

Turning to § 2511(b), we "consider the matter from the child's perspective, placing [the child's] developmental, physical, and emotional needs and welfare above concerns for the parent." **In the Interest of K.T.**, 296 A.3d 1085, 1105 (Pa. 2023) (cleaned up). This analysis "should not be applied mechanically," but "must be made on a case-by-case basis," wherein "the court must determine each child's specific needs." **Id**. at 1105-06 (cleaned up). Thus, there is no "exhaustive list" of factors that must be considered. **Id**. at 1113 n.28. While the circumstances of each case dictate the pertinent factors, our precedent indicates that relevant points of inquiry include "intangibles such as love, comfort, security, and stability." **In re T.S.M.**, 71 A.3d 251, 267 (Pa. 2013) (cleaned up).

The Pennsylvania Supreme Court has mandated, however, that an evaluation pursuant to § 2511(b) should also consider the child's bond with his or her parent. **See In re E.M.**, 620 A.2d 481, 485 (Pa. 1993). Specifically, the court must render "a determination of whether the bond is necessary and beneficial to the child[.]" **In the Interest of K.T.**, 296 A.3d at 1113. This

- 14 -

involves consideration of the effect of severing the child's bond with the parent. *Id*. at 1109. In termination matters, "severance of a necessary and beneficial relationship is the kind of loss that would predictably cause 'extreme emotional consequences' or significant, irreparable harm." *Id*. at 1109-10 (quoting *In re E.M.*, 620 A.2d at 484).

Furthermore, "courts must not only consider the child's bond with the biological parent, but also examine" the child's bond "with the **foster** parent." *In the Interest of K.T.*, 296 A.3d at 1111 (emphasis in original, cleaned up). Thus, we consider factors that arise from the circumstances of each case, such as the child's need for permanency and length of time in foster care, whether the child is bonded with the foster parents, and whether the foster home meets the child's needs. *Id*. at 1113. Overall, "bond, plus permanency, stability and all intangible factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of primary importance in the [§] 2511(b) analysis." *Id*. at 1109 (cleaned up).

In weighing the bond considerations pursuant to § 2511(b), "courts must keep the ticking clock of childhood ever in mind." *In re T.S.M.*, 71 A.3d at 269. "Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id*. Given these crucial concerns, a court cannot "toll the well-being and

permanency" of a child indefinitely in the hope that a parent "will summon the ability to handle the responsibilities of parenting." *In re C.L.G.*, 956 A.2d 999, 1007 (Pa.Super. 2008) (*en banc*) (citation omitted).

As to this subsection, Father contends that DHS did not meet its burden because "nearly every witness with first-hand knowledge of the relationship between Father and the [c]hildren testified that the [c]hildren love Father and enjoy their visits with him." Father's brief at 16. He also laments that there was a dearth of testimony regarding the impact that termination would have on the boys if the parent/child relationship was severed. *Id*. at 17. Father does not discuss any aspect of the relationship or bond between the children and the pre-adoptive foster family.

In its conclusions of law, the trial court cogently addressed DHS's proof of this subsection as follows:

> Evidence was presented before th[e] court that [A.F.A.] and [A.M.A.] have had their share of difficulties as a result of their removal from their parents' [care] by [DHS]. [A.F.A.] in particular has at times demonstrated behaviors which were severe enough to warrant a change in foster care placement during the life of the case. However, the record also strongly supports the conclusion that [A.F.A.] and [A.M.A.] are now thriving with the Thompsons. The Thompsons have incorporated the boys into their home and into their family. In addition to providing a stable and loving home environment, the Thompsons have ensured that the boys continue to attend therapy and actively work with the boys' therapist to help them reach their treatment goals. [The children] have made great progress with their therapy, which is reflected in the decline of the concerning behaviors they once exhibited. Evidence was also presented that [A.F.A.] and [A.M.A.] are doing well in school, participate in sports, and participate in family activities with the Thompsons.

　　　　While the boys love [Father] and want to maintain a relationship with him, their primary desire is to remain with the Thompsons as members of their family. [Father]'s repeated inability to do what is necessary for him to be reunited with his children has left [A.F.A.] and [A.M.A.] in limbo, uncertain of the future. They deserve the stability necessary for them to move on with their lives, and this court finds that their wellbeing would be best served by the termination of [Father]'s parental rights.

Proposed Findings of Fact and Conclusions of Law, 10/16/23, at unnumbered 35.

We again find that the orphans' court's conclusions are fully supported by the evidence of record. As noted, the GAL and the children's legal interest counsel both advocated that the boys need permanency and should be adopted. *See* N.T. Hearing, 9/14/23, at 138, 146. The boys' foster father testified that they are a part of the family and that he "can't imagine life without them." N.T. Hearing, 9/7/23, at 20. He further stated that despite the tremendous progress both children have made while in foster care, they will not fully recover from their trauma until they are in a stable position allowing them to address their anxiety of losing their connection with the Thompson family. *Id*. at 20-21.

The court plainly weighed whether termination of Father's relationship would cause irreparable harm for the children in light of the fact that they love Father and desired continued visitation. However, it justifiably concluded that the developmental, physical, and emotional needs and welfare of A.F.A. and A.M.A. would be served by having the boys remain with the Thompson family, with whom they have bonded. Succinctly, the court did not err in finding that

- 17 -

termination of Father's parental rights would not "cause extreme emotional consequences or significant, irreparable harm." ***In the Interest of K.T.***, 296 A.3d at 1109-10 (cleaned up).

Having determined that the orphans' court properly found statutory grounds for termination pursuant to § 2511(a)(2) and (b), we affirm the orders terminating Father's parental rights as to A.F.A. and A.M.A.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 07/11/2024